**Captain Rebecca J. JACKSON, MD, USAFR, Petitioner,**

v.

**General Lew ALLEN, Jr., Secretary, United States Air Force, Respondent.**

**Civ. A. No. 82–2148–MA.**

United States District Court, D. Massachusetts.

Oct. 26, 1982.

Mary John Boylan, Denner & Benjoya, Boston, Mass., for petitioner.

Charles K. Mone, Asst. U.S. Atty., Boston, Mass., for respondent.

OPINION

MAZZONE, District Judge.

This is a petition for writ of habeas corpus. The petitioner, Rebecca J. Jackson, is a Captain in the United States Air Force Medical Corps. The respondent, General Lew Allen, Jr., is the Secretary of the United States Air Force. The petitioner seeks a

discharge from the Air Force on two grounds: first, the representations by the recruiting officer at the time of her enlistment entitle her to a discharge upon her reimbursement to the Air Force of the expenses it incurred for her medical education; and secondly, that her psychological problems mandate that the Air Force grant her a hardship discharge. Jurisdiction is properly invoked under 28 U.S.C. §§ 1331, 1361 and 2241. Venue is proper in this district under 28 U.S.C. § 1391(e)(4). Pursuant to Fed.R.Civ.P. 52(a), I make the following findings of fact and conclusions of law.

Rebecca Jackson enlisted in the United States Air Force on July 4, 1975, pursuant to the terms of the Armed Forces Professions Scholarship Program (10 U.S.C. § 2120, et seq.) (Program).[1] She executed an agreement entitled Armed Forces Health Professions Scholarship Program Military Service Obligation Agreement (Exhibit 5). That agreement contained a clause which read as follows:

> I also understand and agree to reimburse the Government for all tuition and other educational costs which it incurred, or any portion thereof, as determined by the Secretary of the Air Force, if I fail to complete my obligation under this contract as a result of action not initiated by the Government.

At the time, Rebecca Jackson had some conversation with the recruiting sergeant, expressing her concern about what could happen between her enlistment and seven years later. The sergeant, Jackson alleged, responded that she could pay the money back in lieu of four years of service. Melville Jackson, the petitioner's father, was present at the time and his testimony generally supports his daughter's version of the conversation although Mr. Jackson's recollection of the reason for the "option" as dissatisfaction with a final base assignment, an attitude he found difficult to reconcile with his own experience in the military.

Jackson began her medical education at the State University of New York at Buffalo in September, 1975, and was awarded her medical doctor degree on June 1, 1979. She was given a three year deferment to complete her residency in family practice until June 30, 1982. In her application for deferment from an Air Force residency, she expressed her interest in the area of urban and rural family practice and community medicine, areas which would not be covered in an Air Force residency which involved a different type of population. Moreover, Jackson said "I will have the opportunity to work with an Air Force population when I repay my four year active duty obligation."

In 1980, Jackson sought a year's deferment to be married. That request was denied because of the Air Force policy requiring completion of the Program in the minimum time allowable for board eligibility.

On August 8, 1981, Jackson was advised of her schedule for active duty during July to September, 1982. On September 28, 1981, she executed a Speciality Training and Assignment Preference, listing 6 bases where she preferred to be assigned. Her first preference was Pease Air Force Base, New Hampshire. She indicated she preferred an assignment with hospital facilities as she would like to do obstetrics as part of family practice.

In March, 1982, Jackson was assigned to Grand Forks Air Force Base, North Dakota. This was not one of her listed preferences. She was ordered to report on July 28, 1982 to Sheppard Air Force Base, Texas, for orientation. In May, 1982, Jackson spoke with Colonel Thomas P. Ball, and expressed her concern about going to Grand Forks, mainly because she was required to stay on base rather than being allowed to live in town. Ball checked with the Grand Forks commander, and then explained the housing situation and weather and other conditions to Jackson. He advised her to approach the assignment with a more positive attitude. Two days later, Ball received a call from

---

1. The purpose of the Program was to obtain qualified physicians for the Air Force. Medical school expenses were paid as well as a monthly stipend of $400. In 1975, there were approximately 400 openings. There were 7 to 8 applicants for every opening.

Air Force National Guard Brigadier General Bill Crosscarry, the medical liaison officer in the Pease, New Hampshire area. He suggested a deferment for Jackson because the family practitioner with whom she had been working had a recent heart attack and his practice would be uncovered if Jackson went to Grand Forks. That request was also denied.

Jackson then sought legal counsel. On June 28, 1982, counsel requested a discharge. A formal request was filed on July 23, 1982, for the reasons that active duty would be deleterious to her health for psychological reasons and that her enlistment contract afforded her the option to reimburse the Air Force for her medical education expenses. These expenses were $11,447.98 incurred in medical school expenses and $15,239.88 in stipend.

On July 27, 1982 this action was filed. Thereafter, the Air Force processed the request for discharge. The Air Force considered the reports of Jackson's treating psychologist, Dr. Jeffrey Baker, Ph.D., and her consulting psychologist, Gerald L. Borofsky, Ph.D. Both had concluded that Dr. Jackson was unfit for Air Force duty. Specifically, Dr. Borofsky concluded Dr. Jackson suffered from two mental disorders, Dysthymic Disorder and Mixed Personality Disorder, with dependent, passive-aggressive and borderline features. He opined that she would benefit from psycho-therapy, but not in the military since it would be treatment under conditions that contributed to her disorders. There was also concern that if Captain Jackson were to be forced to serve against her will, there was a potential for suicide. Dr. Borofsky felt she would need treatment for at least three years.

The Air Force conducted its own psychological testing of Captain Jackson by Vincent Escandell, Ph.D. In addition, a psychiatric evaluation was conducted by Colonel Harvey C. Martin, a board certified psychiatrist. Colonel Martin found no clinical evidence of a diagnosable mental disorder, although he did indicate that the psychological testing by Escandell "reflected an individual with some long standing personality

traits of a depressive nature, i.e., questions regarding self worth, sadness, etc., in the context of the presence of strong defenses and an above average capacity for re-integration after stress."

On September 11, 1982, the Air Force denied the request for discharge on both grounds.

On the basis of the foregoing, I conclude and rule as follows:

(1) Rebecca J. Jackson is not entitled to a discharge on the basis of hardship.

(2) Rebecca J. Jackson is not entitled to terminate her active duty obligation by refunding the expenses of her medical education to the Air Force.

I.

Having reviewed the entire record, and after a trial at which the petitioner presented her case, I need not reach the issue of whether this case is reviewable at all. *Orloff v. Willoughby*, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953).

There is no evidence that the Air Force did not follow applicable regulations and procedural processes. *United States, ex rel. Schonbrun v. Commanding Officer*, 403 F.2d 371 (2nd Cir.), *cert. denied*, 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969); *Crotty v. Kelly*, 443 F.2d 214 (1st Cir.1971). Rather, I conclude that the decision of the Air Force which denied a hardship discharge is supported by substantial evidence in the record. *Jenkins v. Commandant First Naval District*, 303 F.Supp. 1150 (D.Mass.1969).

The Air Force relied upon the observations and conclusions of Colonel Martin, a board certified psychiatrist who had reviewed the tests conducted by Dr. Escandell, a qualified psychologist. The record contains a complete and comprehensive evaluation of all of the relevant data, the personal history of Captain Jackson as well as a thorough clinical interview.

On the other hand, Captain Jackson has never submitted any opinion by a licensed psychiatrist. And it is important to note

that while the Air Force psychologist conducted fewer tests than those conducted by the plaintiff's psychologist, Dr. Borofsky admitted that those tests found essentially the same deviations, though stated in a less stark manner. Dr. Borofsky further admitted that the Air Force psychological testing was done in accordance with accepted testing standards.

Moreover, the Air Force was entitled to consider the entire personnel record relative to Captain Jackson's concern over her duty assignment and her attempts to have that duty assignment changed. It is especially noteworthy that the plaintiff's experts did not devote any serious effort to blunting the inferentially damaging timing of Captain Jackson's application.

In accordance with the above, I conclude and rule that Captain Jackson had a full, thorough psychiatric examination by a qualified psychiatrist and that the entire record, including that psychiatric evaluation provided a substantial basis in fact for rejecting her application for a hardship discharge on the ground of psychological unfitness.

### II.

The agreement executed between Captain Jackson and the Air Force is clear on its face. It cannot be interpreted as granting an option to Captain Jackson to repay the expenses of her medical education. Not only would this interpretation defeat the purpose of the program, but it is simply not supported by the specific language of the agreement. *Acko v. Brown,* 489 F.Supp. 216 (D.Minn.1980); *Dacus v. United States,* No. G 80–400 CA (W.D.Mich. 11/20/80).

Given the clarity of the agreement, Captain Jackson seeks to avoid the obligations under the agreement on the basis of oral misrepresentations allegedly made by the recruiting sergeant at the time of her enlistment. She claims these representations misled her and that she believed that she could be excused at any time from her service obligation by simply reimbursing the Air Force for the expenses of her medical education.

First, Captain Jackson's testimony concerning the conversation is not persuasive, nor was it supported by that of her father. Her father's testimony was directed mainly to the lenient treatment of armed forces personnel as compared to his own experience, at least in the choice of assignment after completion of training.

Captain Jackson's testimony itself was vague as to the specific reasons which would suffice as the basis for her inability to serve. Her testimony supports only a conclusion that there was some conversation about her future obligations if she were unable to serve for some generally unforeseen reason. Without a specific concern advanced by Captain Jackson, the recruiter's representations were entirely proper, given the context in which the representations were made.[2] Further support is found in the reason for the insertion of the clause in the agreement; namely, to reimburse the Air Force if for some reason not initiated by the Air Force, she was unable to serve, not because she elected not to serve.[3]

In summary, the enlistment agreement is clear and unambiguous and Captain Jackson fully understood her obligation under the agreement at the time she executed it. She was not induced to enter into the agreement by any fraud or misrepresenta-

---

**2.** The testimony could conceivably have supported two scenarios. First, Jackson could have asked "Suppose I can't serve because I am physically or otherwise unable to serve?" In this context the recruiter's alleged response was proper. Or, Jackson could have asked "Suppose I don't want to serve at that time?" It is hard to believe that an Air Force recruiter, faced with 7 or 8 applicants for every opening in the program, would have responded by pointing out the "escape" clause. This version is a far less credible one.

**3.** Ironically, if Captain Jackson had been granted her hardship discharge on the grounds of psychological unfitness, she could take the position that the granting of the discharge was action initiated by the Air Force in the sense that she was not fit to serve. Accordingly, reimbursement would not be required.

tion, nor by any innocent misrepresentation of the Air Force. *Pence v. Brown,* 627 F.2d 872 (8th Cir.1980). *See also Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) and *DuBeau v. Commanding Officer,* 440 F.Supp. 747 (D.Mass. 1977).

### Conclusion

In accordance with the above, judgment is to be entered for the respondent and the complaint dismissed.

SO ORDERED.