**Christopher M. CASTLE, Plaintiff,**

v.

**Louis CALDERA, Secretary of the Army, Defendant.**

**No. Civ.A. 99–1887.**

United States District Court, District of Columbia.

Nov. 1, 1999.

As Amended Nov. 22, 1999.

Eugene R. Fidell, David P. Sheldon, Kathy S. Ghiladi, Feldesman, Tucker, Leifer, Fidell & Bank LLP, Washington, DC, for plaintiff.

W. Mark Nebeker, Assistant United States Attorney, Washington, DC, for defendant.

## MEMORANDUM OPINION

ROBERTS, District Judge.

Before this Court are defendant's motion to dismiss, or in the alternative, for summary judgment, and plaintiff's cross-motion for summary judgment. At issue is the extent to which plaintiff is bound to fulfill a service obligation to the Department of the Army (the "Army") which plaintiff incurred by pursuing a Ph.D. at the Army's expense. Plaintiff contends that the Army should be enjoined from requiring him to serve an additional six years on active duty because his service agreement permitted him to resign voluntarily from the Army so long as he reimbursed the Army for various educational expenses. The Army counters that plaintiff's request for declaratory and injunctive relief should be denied either because: (1) plaintiff's claim raises a non-justiciable military personnel matter, or (2) plaintiff's service agreement unambiguously gives the Army sole discretion over whether plaintiff could withdraw from his service obligation.

Because I conclude that the Army has put forth the only reasonably objective interpretation of the service agreement, defendant's motion to dismiss or, in the alternative, for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied.

### BACKGROUND

Plaintiff has been an active duty commissioned officer in the United States Army for twelve years. He has ascended to the rank of major and holds both a bachelor's degree and a master's degree in architecture. By all accounts, he has an exemplary military record.

In late 1994, when plaintiff was a captain, his deputy commander asked plaintiff whether he might be interested in enrolling in the Army's Long Term Health Education and Training Program (the "Program"). *See* Second Declaration of

Christopher M. Castle ("Second Castle Decl.") at ¶ 2. The Program enables officers to attend advanced schooling at the Army's expense. *See* 10 U.S.C. §§ 2120–2127 (1994). In the summer of 1995, plaintiff chose to enroll in the Program. *See* Second Castle Decl. at ¶¶ 3–4. Soon thereafter, plaintiff provided his command with information for the application process. *See id.* at ¶ 4.

As part of the application process, Army regulations required plaintiff to submit a completed DA Form 3838. *See* Army Regulation ("AR") 351–3 § 4.4A(a)(1) (1988). DA Form 3838 contains the following "Obligatory Statement:"

> I understand and agree that if selected for training any tender of resignation or request for release from active duty on my part will be disapproved until the total period of obligated active service is completed, except for the convenience of the Government or in case of extreme compassionate circumstances....
>
> I understand that my service obligation will be computed in accordance with AR 351–3....

DA Form 3838 at Block 55 (Ex. B to Pl.'s Mem.Supp.Summ.J.). Plaintiff's application for enrollment in the Program included DA Form 3838, but neither he nor an authorized Army representative ever actually signed the form. *See id.* at Blocks 57, 61. The form was apparently submitted on his behalf by someone at his command. *See* Second Castle Decl. at ¶ 4. The Army then processed plaintiff's application.

On November 5, 1995, plaintiff received a Statement of Service Obligation ("SSO") in the mail along with a letter congratulating him on being admitted into the Program. *See id.* at ¶ 5. Two days later, plaintiff signed the SSO. *See id.* The SSO contains two provisions of particular relevance to this dispute. The first, located in paragraph 1, reads:

> 1. In accordance with Chapter 10, para 10–3(2), AR 351–3, I understand that by participating in the [Program], I will incur an active duty obligation (ADSO)

of three times the length of the education or training for the first year of [*sic*] portion thereof. Participation for periods of education or training in excess of 1 year will result in an ADSO of three times the length of the training, until a maximum of six years is incurred. This adso [*sic*] commences upon completion or termination of my education/training. All provisions of AR 351–3 apply.

SSO at ¶ 1 (Ex. A to Pl.'s Mem.Supp. Summ.J.). Plaintiff thus promised to incur an Active Duty Service Obligation ("ADSO") of a maximum of six years in return for the Army's promise to pay for his advanced schooling.

The second provision at issue is contained in the third paragraph of the SSO. It reads:

> 3. I understand that in the event I voluntarily withdraw, or as a result of misconduct, fail to complete the required ADSO, I will reimburse the United States the cost of advance education, which includes tuition, books, supplies, and other costs clearly identified as paid by the United States, IAW para 10–2, AR 351–3. This does not include pay allowances, or travel expenses.

SSO at ¶ 3. Plaintiff contends that he understood this provision to mean that he could voluntarily withdraw from his ADSO at any time so long as he simply reimbursed the Army for the cost of his advanced education.

In the spring of 1996, plaintiff was accepted into the doctoral program for health facility planning at the Harvard University Graduate School of Design. Plaintiff subsequently received a Request for Orders ("RFO") dated April 26, 1996, which stationed him to Harvard University for three years beginning on September 10, 1996. The RFO also stated in relevant part, "Officer to incur an active duty obligation (ADO) IAW 351–3 (3 times length of schooling but no more than six years.) ADO commences upon completion or ter-

mination of schooling." RFO (Apr. 26, 1996) (Ex. G to Pl.'s Mem.Supp.Summ.J.).[1]

Plaintiff began Harvard's three-year doctoral program as planned in September, 1996. He continued to receive his military pay while the approximately $50,000 cost of his schooling was borne by the Army pursuant to the SSO.[2] Plaintiff has completed his dissertation and is awaiting faculty approval.

Before completing his thesis, however, plaintiff decided that he wanted to leave the Army. Accordingly, plaintiff tendered his resignation from the Army on December 10, 1998, citing the hardships that extended military service had imposed on his family and particularly his wife's ability to provide their children with "a proper Jewish upbringing and Hebrew schooling[.]" Memorandum from Maj. Christopher M. Castle to CDR, PERSCOM (TAPC–PDT–PM) ¶ 4 (Dec. 10, 1998) ("Resignation Letter") (Ex. C to Pl.'s Mem.Supp.Summ.J.). Plaintiff's Resignation Letter acknowledged that he "ha[d] not fulfilled [his] active duty service obligation as specified in AR 135–100." *Id.* at ¶ 3. He also stated his understanding that his resignation, "if accepted, will be accepted under honorable conditions...." *Id.* at ¶ 5. Finally, plaintiff recognized that he might have to reimburse the Army for the costs it had incurred in sending him to Harvard. *See id.* at ¶ 8.

On February 22, 1999, the Army denied plaintiff's resignation request. The denial explained that plaintiff had incurred an "active duty service obligation (ADSO) through 8 September 2005 as a result of [his] participation in the [Program]" and that under "[b]asic Army policy ... officers are expected to fulfill their ADSO before becoming eligible for voluntary separation." Memorandum from Lt. Col. Billie W. Keeler, Chief, Retirements and Separations Branch, to Maj. Christopher M. Castle ¶¶ 2–3 (Feb. 22, 1999) (Ex. D to Pl.'s Mem.Supp.Summ.J.). The Army has further explained that it is severely understaffed in positions requiring officers with plaintiff's education and skills. *See* Decl. of Col. Douglas Hewitt, Deputy Chief, Medical Service Corps Branch, United States Army ("Hewitt Decl.") at ¶¶ 9–13 (Attach. to Def.'s Mem.Supp.Mot. to Dismiss, or in the Alternative, Summ.J.). This shortage is apparently even more acute at higher ranks, such as plaintiff's. *See id.*[3]

On March 10, 1999, the Army issued plaintiff new orders, notifying him that, after his graduation from Harvard, he was to report to Korea no later than October 13, 1999, to begin a two-year tour of duty. *See* RFO, Mar. 10, 1999 (Ex. 3 to Hewitt Decl.).[4] The RFO indicated that plaintiff's family would have the option of accompanying him to Korea at the Army's expense. *See id.* After his arrival in Korea, plaintiff was slated to assist in the major renovations planned for the 121st Evacuation Hospital. *See* Hewitt Decl. at ¶ 5. Plaintiff's absence could "degrad[e] the current climate of health care in the region for all soldiers there, and ultimately affect[ ] the

---

1. The terms "active duty obligation" (ADO) and "active duty service obligation" (ADSO) are used interchangeably by the parties.

2. Over the course of plaintiff's studies at Harvard, plaintiff earned approximately $195,000 in military pay and allowances. *See* Def.'s Statement of Material Facts as to Which There is No Genuine Dispute ("Def.'s Stmnt.") at ¶ 19. Plaintiff reportedly earned $60,000 in 1996–1997, $65,000 in 1997–1998, and $70,000 in 1998–1999. *See id.*

3. Plaintiff is a Health Services Material Officer, specializing as a Health Facility Planner

("HFP"). *See* Hewitt Decl. at ¶ 2. HFPs possess very specialized skills generally requiring a degree in Engineering, Architecture, Medical Planning, or a similar discipline. *See id.* at ¶ 7. According to the Army, only 65.8% of authorized HFP positions are currently filled and, at senior ranks, that figure drops to 31.4%. *See id.* at ¶ 9. Plaintiff will also be only the second HFP in the Army to have received a Ph.D. *See id.*

4. The Army has since pushed back plaintiff's report date to November 3, 1999, to facilitate the Court's resolution of this matter.

readiness of the force in that region...."
*Id.*

On March 29, 1999, plaintiff's counsel formally requested that the Army reconsider its denial of plaintiff's unqualified resignation, arguing that the only condition that the SSO placed on plaintiff's ability to voluntarily withdraw from his ADSO was that he reimburse the United States for the costs it had incurred in sending him to Harvard. *See* Letter from Kathy S. Ghiladi, to Lt. Col. Billie W. Keeler (Mar. 29, 1999) (Ex. E To Pl.'s Mem.Supp. Summ.J.). On May 3, 1999, the Army advised plaintiff that its position remained unchanged, adding that, regardless of any misunderstanding about the terms of his SSO, plaintiff's acceptance of his assignment to Harvard fully ratified his commitment to serve an additional six-years in the Army. Letter from Lt. Col. Billie W. Keeler to Kathy S. Ghiladi (May 3, 1999) (Ex. F to Pl.'s Mem.Supp.Summ.J.).

Plaintiff brought this suit on July 12, 1999, seeking a declaration that the Army's denial of his resignation request was unlawful and an injunction ordering the Army to vacate his ADSO. Defendant moved to dismiss, or in the alternative for summary judgment. Defendant argues that plaintiff's claims should be dismissed either because he seeks review of a nonjusticiable military personnel decision or because he has a valid and binding contractual obligation to complete his ADSO.

Plaintiff responded with a cross-motion for summary judgment and a motion for a preliminary injunction.[5] He argues that

his case presents a justiciable contract claim and that the only condition placed on his ability to withdraw from his ADSO is that he reimburse the Army for the costs it incurred in sending him to Harvard. Plaintiff's ultimate contention, therefore, is that his stated willingness and[1] ability to repay his educational expenses renders the Army's denial of his resignation request unlawful.

## ANALYSIS

### A. Justiciability

The Army urges this Court not to reach the merits of plaintiff's claim, citing the bedrock principle that internal military affairs are not the province of the courts. *See, e.g., Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842 (1953) (warning that "judges are not given the task of running the Army.... Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters"); *Chappell v. Wallace,* 462 U.S. 296, 300–04, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *United States v. Stanley,* 483 U.S. 669, 683, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987). However, as the Court of Appeals for this Circuit has noted, "[m]any cases hold that civilian courts may apply traditional contract principles in construing the rights and obligations arising under enlistment contracts and, by analogy, active duty agreements." *Cinciarelli v. Carter,* 662 F.2d 73, 78 (D.C.Cir.1981).[6]

---

**5.** Plaintiff's motion for a preliminary injunction was denied from the bench on October 25, 1999.

**6.** The Supreme Court recognized long ago in the venerable case of *United States v. Grimley,* 137 U.S. 147, 150–53, 11 S.Ct. 54, 34 L.Ed. 636 (1890), that enlistment is a contract between the United States and the enlistee and is accordingly governed by ordinary contract law. Courts of appeals have since ruled on many claims involving the interpretation and validity of a service member's contractual obligation to a branch of the armed forces. *See, e.g., Ferrell v. Secretary of Defense,* 662 F.2d

1179, 1182 (5th Cir. Dec.1981) (determining right to training under Navy enlistment contract); *Lundgrin v. Claytor,* 619 F.2d 61, 64–65 (10th Cir.1980) (deciding deferment rights under Armed Forces Health Professions Scholarship Program service agreement); *Pence v. Brown,* 627 F.2d 872, 875 (8th Cir. 1980) (construing rank rights under Air Force enlistment contract in light of recruiter's representation); *Peavy v. Warner,* 493 F.2d 748, 750 (5th Cir.1974) (remanding for determination regarding cancellation request under Navy member's service agreement); *Johnson v. Chafee,* 469 F.2d 1216, 1219–20 (9th Cir.) (determining validity of extension of Navy en-

■ Plaintiff is asserting that his SSO, which is his agreement with the Army, permits him to voluntarily withdraw from his active duty obligation so long as he repays the expenses connected with his doctoral studies. Plaintiff's cause of action thus sounds in contract and this Court may therefore review such a claim "without venturing beyond the conventional judicial function." *Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1514 (D.C.Cir. 1989).

## B. Interpretation of the SSO

### 1. Summary Judgment Standard

■ Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Cases involving contractual interpretation "may be resolved as a matter of law if the contested agreement admits of only one reasonable interpretation." *United Mine Workers of Am.1974 Pension v. Pittston Co.*, 984 F.2d 469, 473 (D.C.Cir.), *cert. denied*, 509 U.S. 924, 113 S.Ct. 3039, 125 L.Ed.2d 726 (1993). In coming to this determination, courts are "not limited to the four corners of the agreement: the party moving for summary judgment may submit affidavits and other extrinsic evidence that gives color to the words of the agreement or otherwise reveals the intent of the contracting parties at the time of the agreement." *Id.* Moreover, the D.C. Circuit has repeatedly noted that, even where a contract is am-

biguous, summary judgment may be appropriate "so long as there is no evidence that would support a conflicting interpretation of the agreement." *America First Inv. Corp. v. Goland*, 925 F.2d 1518, 1522 (D.C.Cir.1991) (citing *Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C.Cir.1990)).

### 2. The Parties' Contentions

Both parties have submitted extrinsic evidence in the form of affidavits and correspondence to support their respective interpretations of the SSO.[7] In attempting to divine the parameters of the parties' contractual obligations, however, this Court turns first to the language of the agreement itself.

The parties train their sights on two discrete paragraphs of the SSO. Plaintiff's construction targets Paragraph 3 which states that "in the event that [plaintiff] voluntarily withdraw[s], or as a result of misconduct, fail[s] to complete the required ADSO, [plaintiff] will reimburse the United States the cost of advance education...." SSO at ¶ 3. Plaintiff reads this provision as a "buy-out" right which permits him to voluntarily withdraw from his ADSO so long as he reimburses the Army for paying his educational expenses.

According to the Army, plaintiff's argument misfires by ignoring the first paragraph of the SSO. Paragraph 1 indicates that, by participating in the Program, plaintiff will "incur an active duty obligation (ADSO) of three times the length of the education or training for the first year of [*sic*] portion thereof." In addition, the

---

listment agreement), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2146, 36 L.Ed.2d 686 (1973); *Shelton v. Brunson*, 465 F.2d 144, 146–47 (5th Cir.1972) (construing provision of Air Force reenlistment contract).

7. It is thus appropriate to dispose of the Army's Motion to Dismiss or, in the Alternative, for Summary Judgment, in accordance with Rule 56 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 12(b) (providing that, where a defendant's motion to dismiss

for failure to state a claim upon which relief can be granted includes "matters outside the pleadings" which are "not excluded by the court," the court shall dispose of the motion under Rule 56 and "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."). Plaintiff, having filed a cross-motion for summary judgment, has been given an adequate opportunity to respond to the extrinsic evidence attached to defendant's Motion.

last sentence of paragraph 1 incorporates by reference the provisions of AR 351–3. Section 10.2.F of AR 351–3 provides that a resignation or request for release from active duty by an "officer performing a period of ADO incurred under this regulation will not be favorably considered except ... when in the best interest of the Government and under applicable law." AR 351–3 § 10.2.F (1988). Thus, the Army maintains that the plain language of the SSO, when read in conjunction with AR 351–3, leaves the resolution of plaintiff's resignation request at the Army's complete discretion.

Plaintiff counters that the relationship between paragraph 3 and paragraph 1 is ambiguous at best and that the entire agreement can reasonably be interpreted as placing only one condition—reimbursement of educational expenses—on plaintiff's ability to withdraw from the Army. Under this reading, paragraph 1 merely recites the consideration for the bargain while paragraph 3 sets forth the actions which the plaintiff may take to be relieved of his active duty obligation. Moreover, plaintiff claims that the incorporation of AR–351 into paragraph 1 does not render his reading of the SSO unreasonable because section 10.2.F of AR 351–3 applies only to an "officer performing a period of ADO[.]" *Id.* Plaintiff, by contrast, had not technically begun his active duty obligation when he submitted his request for resignation while still at Harvard.

3. *Discussion*

■ This action may never have been commenced had the Army obtained plaintiff's signature on DA Form 3838, which provides in the plainest of terms under the heading "Obligatory Statement" that "any tender of resignation or request for release from active duty on [plaintiff's] part will be disapproved until the total period of obligated service is completed except for the convenience of the Government or in case of extreme compassionate circumstances." DA Form 3838 at Block 55. However, that did not happen, nor does the SSO contain the Obligatory Statement's unmistakable admonition.[8] The door to this litigation thus opened.[9]

■ Without DA Form 3838 as a guide, the operative question becomes whether the SSO itself "admits of only one reasonable interpretation" such that there is no genuine issue of material fact as to its meaning. *United Mine Workers*, 984 F.2d at 473. This reasonableness inquiry is largely the same under both the law of the District of Columbia and the federal common law as embodied by the principles set forth in the Restatement (Second) of Contracts. *See Bowden v. United States*, 106 F.3d 433, 439 (D.C.Cir.1997) (noting that the principles set forth in the Restatement "represent the 'prevailing view' among states") (quoting E.A. Farnsworth, *Farnsworth on Contracts* § 7.3 (1990)). Under both regimes, courts decide whether a contract is ambiguous by looking to "the

8. *Compare Clark v. Widnall*, 51 F.3d 917, 919 (10th Cir.1995) (service contract itself provided, "I will not be relieved of my active duty obligation solely because I am willing and able to reimburse the Government for the total cost of advanced education.").

9. Contrary to plaintiff's contention, however, the Army's failure to obtain plaintiff's signature on DA Form 3838 before processing his application does not automatically render plaintiff's reading of the SSO correct as a matter of law. Army regulations place the onus of submitting a completed DA Form 3838 squarely on the applicant. *See* AR 351–3 at § 4.4.A(a)(1) (1988). Plaintiff cites *Wallace v. Brown*, 485 F.Supp. 77 (S.D.N.Y.1979),

for the proposition that the Army's failure to obtain plaintiff's signature on DA Form 3838 vitiates any obligation he may have had to the Army. *See* Pl.'s Mem.Supp.Summ.J. at 12. *Wallace*, however, simply held that a valid service obligation based on educational training for active duty must be imposed by a signed statement. Here, DA Form 3838 was merely a part of plaintiff's application to the Program. The SSO, which both plaintiff and an authorized Army representative signed, is a legally operative memorialization of the parties' agreement. Accordingly, the Army's failure to produce a signed DA Form 3838 does not invalidate plaintiff's ADSO.

meaning a reasonable person in the position of the parties would have given the disputed provision." *LJC Corp. v. Boyle,* 768 F.2d 1489, 1495 (D.C.Cir.1985) (citation omitted); *see also Adler v. Abramson,* 728 A.2d 86, 88–89 (D.C.1999); Restatement (Second) Contracts § 203(a) (1979). This standard mode of contract interpretation not only presumes that "the reasonable person knows all the circumstances surrounding the making of the contract[,]" but it also requires that a "reasonable person [be] bound by all usages which either party knows or has reason to know." *Intercounty Constr. Corp. v. District of Columbia,* 443 A.2d 29, 32 (D.C.1982); *see also* Restatement (Second) Contracts § 20 cmt. d (1979) ("[A] party may be bound by a merely negligent manifestation of assent, if the other party is not negligent.").

■ The plain language of the SSO, the regulations it cites, the circumstances surrounding its making, the plaintiff's own correspondence, and precedent support— as the only reasonable interpretation of the SSO—the conclusion that plaintiff has no right to buy out his service obligation. Paragraph 1 of the SSO unambiguously imposed upon plaintiff an active duty obligation which he does not ·dispute. His April 26, 1996 Request for Orders repeated it, and plaintiff acknowledged it when he stated in his Resignation Letter that he "[had] not fulfilled [his] active duty service obligation...." Resignation Letter at ¶ 3.

Contrary to plaintiff's contention, moreover, the plain language of paragraph 3 of the SSO created no affirmative right enabling him to avoid his obligation through reimbursement. Rather, paragraph 3 is nothing more than a warning to enrollees in the Program that if by their own choice or misconduct, they fail to fulfill their obligations, they may be called upon to repay the government for the costs of their advanced education. As another court interpreting a similar service agreement cogently put it, what plaintiff wants to convert into a buy-out provision

merely provides that if a participant fails to complete his or her active duty obligation for a reason other than a Government-initiated action, reimbursement must be made. Nowhere are repayment schedules or interest amounts set forth and nowhere does [the reimbursement clause] or any other part of the contract, or other document, statute or regulation, provide any language enabling a participant in the program to opt for repayment rather than the active service expressly required.

*Acko v. Brown,* 489 F.Supp. 216, 220 (D.Minn.1980). Likewise, the mere fact that paragraph 3 of plaintiff's SSO provided that he would be obliged to reimburse the Army "in the event that [he] voluntarily withdr[ew]" from the Program by no means implies that plaintiff had an affirmative right to be released from his service obligation simply because he professed his willingness and ability to repay the Army.

The SSO when read in its entirety also undercuts plaintiff's interpretation. Paragraph 1 explicitly incorporates by reference Army Regulation 351–3, which is mentioned no less than three times in the one-page SSO. *See* SSO at ¶¶ 1, 3. The D.C. Circuit has held that "[w]hen a contract incorporates a regulation by reference, that regulation becomes a part of the contract for the indicated purpose as if the words of the regulation were set out in full in the contract." *United States v. Insurance Co. of N. Am.,* 131 F.3d 1037, 1042 (D.C.Cir.1997). AR 351–3 not only states that resignation requests by officers on active duty would not be favorably considered except "when in the best interest of the Government and under applicable law[,] AR 351–3 § 10.2.F, but it is also bereft of any language which would lead a reasonable Army officer to believe that he or she had an affirmative right to withdraw from an ADSO with reimbursement as the sole precondition."

Plaintiff would have known and understood these regulations, as his counsel

rightly conceded at oral argument. Plaintiff is an officer on active duty in the United States Army where he has spent his entire career. Indeed, plaintiff is by all accounts an intelligent, highly-educated, and well-trained military officer. He has an enviable record of academic achievement, having earned a bachelor's degree, a master's degree, and is now on the verge of a earning a doctoral degree. When plaintiff tendered his resignation, he stated that he "underst[ood] that this resignation, *if accepted,* will be accepted under Honorable conditions. . . ." Resignation Letter at ¶ 5 (emphasis added). The "if accepted" caveat reveals at least some recognition by plaintiff that he did not have a right to extinguish unilaterally his active duty obligation. There is certainly no evidence that any Army official ever told plaintiff, or that he relied on any representation, that he could pay his way out of his ADSO.

Well before plaintiff sought to resign in exchange for reimbursement, other courts had squarely rejected the very "buy-out" interpretation which he propounds. *See Jackson v. Allen,* 553 F.Supp. 528, 531 (D.Mass.1982) ("Not only would this interpretation defeat the purpose of the [P]rogram, but it is simply not supported by the specific language of the agreement"); *Acko,* 489 F.Supp. at 221 ("At most, the Court could believe that plaintiff thought that [the reimbursement provision] might provide a loophole. However, as much as the Court sympathizes with her current

plight, such a belief is insufficient to void the [c]ontract.").

Plaintiff can find no support for his argument in the articulated purposes for having this educational program. The Program was created "to provide medical and dental manpower for the all-volunteer Army" and "was not a scholarship program designed to benefit the public at large." *Acko* 489 F.Supp. at 220.[10] Plaintiff instead claims that he reasonably understood the SSO to mean that the Army promised to send him to Harvard, to cover all of his expenses, to continue to disburse his military salary, and that in return, he promised only to reimburse all educational expenses should he have second thoughts about fulfilling his side of the bargain. This cannot be.

Finally, plaintiff presents no evidence of any Army custom permitting such buyouts. He has failed to allege or establish that other officers had avoided through reimbursement alone any ADSOs incurred pursuant to the Program.

### CONCLUSION

In short, plaintiff has no legal or factual basis which would entitle him to proceed to trial. There is nothing in this record other than plaintiff's own purely subjective claimed beliefs to support his contention that he could unilaterally terminate his active duty obligation. Nor is there anything in this record to suggest that the Army abused its discretion by denying

---

10. The Program was created by the Uniformed Services Health Professions Revitalization Act of 1972, Pub.L. No. 92–426, 78 Stat. 1064 (1972) (codified as amended at 10 U.S.C. §§ 2120 – 2127 (1994)). The impetus behind the passage of this legislation was the fact that "[t]he uniformed services [were] facing a short term and long range problem in the attraction and retention of medical personnel that [was] approaching crisis proportions." S.Rep. No. 92–827, at 8 (1972). The Program was thus specifically designed "[f]or the purpose of obtaining adequate numbers of commissioned officers on active duty who are qualified in the various health professions. . . ." 10 U.S.C. § 2121 (1994).

Though plaintiff properly points out that section 2123(e)(1)(C) of the statute governing the Program contains language substantially similar to paragraph 3 of the SSO, *see* Pl.'s Reply to Def.s Opp. to Pl.'s Mot.Summ.J. at 2–3, this provision does not provide any support for plaintiff's buy-out theory. Like paragraph 3 of the SSO, section 2123(e)(1)(C) of the statute merely indicates that, if the enrollee does not fulfill his active duty obligation, he may be called upon to reimburse the United States for the cost of the advanced education. It does not mean that reimbursement stands as the sole barrier to escaping an active duty obligation.

plaintiff's request for a resignation. Given the shortage of officers with plaintiff's attributes and training, the Army understandably concluded that it could not afford to allow Major Castle to renege on his obligation to put to work in the Army's service the new skills he had acquired at the Army's expense. Therefore, despite the numerous sacrifices plaintiff has made during his many years of service to this nation, summary judgment must be entered in favor of the defendant. A separate Order consistent with this Opinion has been filed this same day.